IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 23-CR-30007-SPM |
| | ) | |
| KEVIN L. SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Now comes, The United States of America, by Steven D. Weinhoeft, United States Attorney for the Southern District of Illinois, and through John D. A. Trippi, Assistant United States Attorney, who provides the Court with the Government's Sentencing Memorandum.

**I.   Introduction:**

After more than two and a half years in custody, Defendant has finally arrived at sentencing following his guilty plea on July 1, 2024. Without a doubt, the sentencing outlook today is very different than what the parties contemplated in the summer of 2024 and earlier. The difference, or the fault for the increased sentencing exposure, lies entirely on the Defendant and his choice to scuttle a generous plea agreement. He faces higher sentencing guidelines because he committed additional crimes, repeatedly harassed the victim, and continued threatening her from jail. His behavior shows that he has not accepted responsibility for his actions, he does not appreciate the full seriousness of his

crimes, he continues to pose a danger to the community, and a high risk for recidivism.

II. **Offense conduct: Defendant kidnapped his pregnant girlfriend at gun point to force her to obtain an abortion.**

On December 6, 2022, the kidnapping victim, L.A., text Defendant a photo of a positive instant pregnancy test with the caption "Bae im pregnant." When L.A. and Defendant talked that night, Defendant offered his opinion that L.A. should get an abortion. L.A. said she would call Planned Parenthood and make an appointment.

The following morning, L.A. awoke and had a change of heart. She told Defendant that she did not want to get an abortion. Later, when L.A. was interviewed by Fairveiw Heights detectives, she said that Defendant's response to her decision was blunt: "I'm going to kill you, bitch." This appears to be the first in a litany of death threats Defendant conveyed to L.A. that day.

Early on the morning of December 7, 2022, L.A. went to work for a temporary job cleaning at a gas station in St. Charles, Missouri. She planned to work a four hour shift, but Defendant knew where she was working. L.A. told the manager of the gas station that she scared Defendant would kill her if she refused to get an abortion. Just fifteen minutes into her shift, Defendant arrived at the gas station looking for her. L.A. later explained that Defendant thought she was going to run off and not get the abortion. L.A. exited the gas station and entered Defendant's car on the parking lot, where they argued about the abortion.

After arguing for approximately 30 minutes, Defendant drove off of the gas station parking lot in St. Charles, and began driving to the Planned Parenthood in

2

Fairview Heights, Illinois. L.A. later testified that she did not want to go there and did not want to get an abortion. While Defendant drove, L.A. text messaged her mom, sister, and uncle providing what amounted to a live, play-by-play of her own kidnapping. With L.A.'s permission, investigators later extracted the data from her phone, providing evidence of this contemporanous account of her kidnapping.

    L.A. text messaged her sister, "I'm finna die", "he got a gun on me cause I'm pregnant", "he said he gone kill me", "I'm in this car with him and he cocked the gun…", and "He saying he gone kill me." L.A. told her sister her plan for escaping, saying "Imma go in here [Planned Parenthood] and let them know slide them a note or some." L.A. also told her sister, "He saying I'm 21 and I'm a lil girl but he lied about his age to get in my pants."

    L.A. told her uncle, "We going to the abortion clinic he talm [sic] bout if I don't get it then he gone call [sic] me", "He got this gun out on me", and "He said if anybody pull up he gone kill me first."

    Text messages from L.A. to her mother during the kidnpping included: "Momma… How I go under witness protection?" "Ion know what's finna happen but I love you momma", "I'm scared but I got a feeling this ain gone end well", and "…he pulled a gun on me." When L.A.'s mom said that she was calling the police and going to have them track L.A.'s phone, L.A. responded, "what if before they get here he kill me", and "he saying that I ain gone have no protection cause he gone kill me."

    L.A.'s uncle took the threats seriously and drove from his home in Granite City to the Planned Parenthood in Fairview Heights. L.A. had shared her phone's location with

her uncle, and he confirmed she was at the Planned Parenthood. Defendant and L.A. had arrived at Planned Parenthood before the clinic opened, so Defendant parked and waited in the parking lot. The uncle positioned himself within view of Defendant's car at Planned Parenthood, called 911, and relayed that his niece was being held at gunpoint at the Planned Parenthood.

Within minutes of the 911 call, three Fairview Heights Police Department squad cars entered the Planned Parenthood parking lot. As the police arrived, Defendant began to leave, driving toward the parking lot's exit. Only after the officers illuminated their emergency lights did Defendant stop.

While the police officers arrested Defendant, an officer checked on L.A. in the front passenger seat. L.A. emerged from car saying, "I'm scared, he threw the gun in the grass over there [motioning]. I need witness protection of something, he is gonna kill me." Shortly thereafter, officers walked to the edge of the parking lot where L.A. gestured and found Defendant's Glock 27 .40 caliber pistol with an extended magazine. Officers photographed and collected the firearm, which was loaded with 12 cartridges and an additional round in the firing chamber. Surveillance video showed it was thrown from the driver's side of Defendant's car as the police turned behind his vehicle.

Defendant and L.A. were transported separately to the Fairview Heights Police Department. On the way to the police station, the transporting officer's dash cam captured the Defendant talking from the back seat of the squad car and saying, "It's my son's birthday and I'm trying to prevent having another kid…"

When L.A. was interviewed at the police statation she explained the sequence of events and expanded on the threats by Defendant. When L.A. asked Defendant what would happen if she did not get an abortion, she said Defendant responded, "I'm going to kill you, bitch." Defendant told L.A. that if she did not get an abortion it would ruin his life.

L.A. stated that after she got into his car at the gas station in St. Charles, he just drove off and said, "you're coming with me." L.A. said that when they got near downtown St. Louis, Defendant "cocked" his gun. She later testified that cocking the gun was meant to scare her. L.A. told the detectives that Defendant said, "Bitch, I'm gonna take you over there and put you in some field." He continued, threatening, "Bitch it aint gonna be funny when we get over to Illinois and I pull over to some field and shoot your motherfucking ass." According to L.A., he also said, "It will be real motherfucking funny when I blow your brains out." L.A. said that Defendant had his gun out and sitting on his lap while he drove. L.A. told the detectives that she never tried to get out of Defendant's car because she knew Defendant was serious and she knew he had a gun.

L.A. told the detectives that while they were parked at Planned Parenthood, the threats continued with Defendant saying that she was going to get the abortion or he was going to kill her. L.A. also confirmed that Defendant said, "if someone pulls up, I'm going to kill your ass first." L.A. then showed some text messages to the detectives, and gave written consent and the passcode to her handset for the detectives to extract the rest of the text messages and data from her phone.

From the time Defendant was arrested and through his entire interview with

5

police, he feigned ignorance and lied. Initially he questioned why the police even came to the Planned Parenthood, supposing that it was just because they arrived too early. Defendant claimed that Antrum asked him to pick her up for a ride to Planned Parenthood, and that they never yelled or argued. Defendant denied ever threatening L.A., and even denied possessing a gun.

### III. After pleading guilty, Defendant obstructed justice and continued threatening L.A.

Even after Defendant sat in jail for over a year and a half, he was still not done manipulating and threatening L.A. As detailed in the *Government's Objection to the PSR* (Doc. 96) and *Supplemental Notice of Intent to Withdraw Sentencing Recommendation* (Doc. 93), Defendant engaged in a lengthy campaign from the Jefferson County jail to persuade L.A. to support his objections to the PSR. Defendant's plea agreement allowed him to make an argument that the special offense characteristic for using a deadly weapon during the kidnapping did not apply. Doc. 68. Defendant wanted to strengthen his argument that he did not use a firearm during the course of the kidnapping. If Defendant's PSR objection was successful, two points would be removed from his total offense level and his low-end guideline would be reduced from 108 to 87 months.

Beginning in June 2024, Defendant used coded language to repeatedly propose that L.A. support his objection by saying that say she assumed the firearm was in the car, but she never actually saw the firearm. That, of course, was a complete fabrication. L.A. had been crystal clear that she saw the Defendant's handgun, that he had "cocked" the firearm near downtown St. Louis, and that he made specific, graphic death threats toward her while his gun was sitting on his lap.

In October of 2024, the issue came to a head across a series of jail phone calls. L.A. resisted Defendant's fabricated narrative and proposed that they just be real and honest. She told Defendant that "if you really was that kind of person and you really didn't do nothin… you wouldn't be coercing that shit every phone call."

Defendant could not abide this defiance from L.A., and about 20 minutes later he levied a veiled threat against L.A., saying, "I'll get out of jail. Don't trip. One of these days, dog, I'll be out for ya, don't trip." L.A. recognized this threat for what it was and immediately hung up. She ignored four calls by Defendant in the next fifteen minutes.

Once these phone calls and text messages were discovered, the Government immediately moved to be released from the plea agreement arguing that Defendant had breached the plea agreement by committing additional crimes. Doc. 79. Ultimately, Defendant conceded that he violated the terms of the plea agreement and waived his right to an evidentiary hearing. Doc. 106. Defendant's conduct showed that he would go to extreme lengths to distort the evidence, present false testimony to the sentencing Court, and that he still had not accepted responsibility for his crime.

## IV.    Pregnancy plus intimate partner violence and firearms: a recipe for tragedy.

The shockingly high prevalence of violence in domestic relationships remains a stubborn facet of American society. Homicides by intimate partners (husbands, lovers, ex-husbands, or ex-lovers) account for 40-50% of all homicides of women, more than any other type of perpetrator.[1] Academics studying the risk factors for intimate partner

---

1 Campbell et al: *Risk Factors for Femicide in Abusive Relationships: Results From a Multisite Case Control Study* AMERICAN J OF PUB HEALTH 93, 1089, *available at*:
https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.93.7.1089?download=true

7

violence (IPV) have established strong evidence linking violence, access to firearms, and threats to use firearms. "Abusers' previous threats with a weapon and threats to kill were associated with substantially higher risks for femicide."[2] Controlling for other variables, the risk factor of an abuser making previous threats with a weapon was found to raise the risk of femicide by four times.[3] Conversely, if the abuser had a prior arrest for domestic violence, the risk for femicide dropped, "suggesting that arrest of abusers protects against future intimate partner femicide risks."[4] When an abuser used a gun in the worst incident of abuse, there was a 41-fold increase in the risk of femicide.[5]

Unfortunately, the number of women who have been threatened with firearms by intimate partners is staggeringly high, with scholars calculating that some 4.5 million American women have experienced such threats.[6] In a survey of battered women living in 67 different women's shelters, researchers found that when abusers had access to firearms, "Nearly two thirds (64.5%) responded that the partner had used one of the guns to scare, threaten, or harm her. When asked what happened during the incident, 71.4% of these 98 women reported that the partner threatened to shoot or to kill her."[7]

The risks of IPV are not uniform across demographics, and just being pregnant heightens the risk of IPV. Shockingly, numerous studies have concluded that more

---

[2] *Id.* at 1090.
[3] *Id.*
[4] *Id.* at 1092.
[5] *Id.* at 1091.
[6] Sorenson, Susan B., and Rebecca A. Schut, *Nonfatal Gun Use in Intimate Partner Violence: A Systematic Review of the Literature*, TRAUMA, VIOLENCE & ABUSE 19, no. 4 (2018): 431–42, https://www.jstor.org/stable/26638225.
[7] Susan B. Sorenson and Douglas J. Wiebe, *Weapons in the Lives of Battered Women,* AMERICAN J OF PUB HEALTH 94, 1412–17, 1414 https://doi.org/10.2105/AJPH.94.8.1412.

women die from homicide during pregnancy than all the leading medical causes of maternal mortality, including preeclampsia, hemorrhage, and infection.[8] Examining National Center for Health Statistics data from 2018-19, researchers found a 16.2% higher homicide rate for pregnant women (3.62 deaths per 100,000) than for non-pregnant women (3.12 deaths per 100,000).[9] The problem is getting worse, too. Longer term studies showed that the incidence of violent death (homicides and suicides) doubled from 2005 to 2022.[10] The same study showed that pregnant, black women between the ages of 18 and 24 experienced a far higher homicide rate of nearly 8 deaths per 100,000.[11] Black women like L.A. are at especially high risk during pregnancy; they are five times more likely to die by a firearm during pregnancy and postpartum than white women.[12] L.A. also fits into the unfortunate category of the 45% physical and sexual abuse victims who first experienced abuse before the age of 25.[13]

In addition to the potential for death or serious injury, the effects of intimate partner violence during pregnancy can linger, causing other significant problems.

---

[8] Wallace, Maeve et al., *Homicide During Pregnancy and the Postpartum Period in the United States, 2018–2019*. OBSTETRICS & GYNECOLOGY 138(5): November 2021, p. 762-69; Lawn, Rebecca B, and Karestan C Koenen, *Homicide is a leading cause of death for pregnant women in US,* BMJ (BRITISH MEDICAL JOURNAL CLINICAL RESEARCH ED.) vol. 379, 19 Oct. 2022; Boyle KM, Regoeczi W, Meyer CB, *State Divorce Laws, Reproductive Care Policies, and Pregnancy-Associated Homicide Rates, 2018-2021,* JAMA NETW OPEN. 2024;7(11).
[9] Wallace, *supra* note 8.
[10] Hooman A. Azad et al., *Homicide and Suicide: The Leading Cause of Maternal Death, and How Firearm Legislation Affects It*, PREGNANCY, January 2025(1), *abstract available at* https://www.smfm.org/news/new-national-study-finds-homicide-and-suicide-is-the-1-cause-of-maternal-death-in-the-us
[11] *Id.*
[12] Tobin-Tyler, Elizabeth. *Intimate Partner Violence, Firearm Injuries and Homicides: A Health Justice Approach to Two Intersecting Public Health Crises*. J LAW MED ETHICS. 2023;51(1):64-76.
[13] The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence, CENTERS FOR DISEASE CONTROL p.8, available at https://www.cdc.gov/nisvs/documentation/NISVSReportonIPV_2022.pdf

> Intimate partner violence during pregnancy can lead to significant psychological trauma and mental health problems for pregnant women. Pregnant women who experience IPV are at increased risk of depression, anxiety, and PTSD. Depression is a common mental health problem experienced by pregnant women who have been exposed to IPV… Maternal mental health problems can have long-lasting effects on the mother and can also impact the health and well-being of the baby. For example, depression during pregnancy has been linked to a higher risk of preterm birth and low birth weight. Infants born to mothers with untreated depression or anxiety may also be at increased risk of developmental delays and behavioral problems.[14]

A scholarly review of the factors associated with non-fatal intimate partner gun violence reached an obvious conclusion that bears repeating: "A gun needn't be fired to be an effective weapon against an intimate partner; displaying or threatening with a gun can facilitate coercive control, a foundation of chronic and severe abuse."[15]

V. **Application of the 18 U.S.C. § 3553 Sentencing Factors**

1. nature and circumstances of the offense and the history and characteristics of the defendant;

Defendant's repeated, vicious threats to kill L.A. fit into a longer and consistent history of domestic violence and abuse. The Government acknowledges that Defendant has just one domestic violence conviction from 2009, but that grossly underrepresents his history of domestic violence. Nonetheless, the hallmarks of violence and coercive control are all over the police reports and applications for orders of protection against Defendant dating back nearly twenty years. As the Court found in the order Denying Defendant's Motion to Revoke the Order of Detention, "Smith has had multiple protective orders

---

[14] Agarwal et al. *A Comprehensive Review of Intimate Partner Violence During Pregnancy and Its Adverse Effects on Maternal and Fetal Health*. CUREUS J OF MEDICAL SCIENCE. 2023 May 20, p. 3.
[15] Sorenson, *supra* note 6, at 442.

against him and defied the conditions of his previous supervised release. Smith has a demonstrated history and pattern of using intimidation and violence against his victims and disregarding the law whenever it suits him." Doc. 55, p. 6.

In February and June of 2006, St. Louis City Metro Police took reports of Domestic Assault Third Degree, Property Damage 2nd Degree, and Harassment against Defendant. Exhibit 1, Prior Domestic Reports[16], p. 1–2. CAD notes from this case are very sparse, but they include the remark that, "Subject hit the pregnant victim several times in her stomach." *Id.* at 1. Defendant was arrested on these charges on January 31, 2007, but released the next day when a warrant could not issue because "victim unavailable." *Id.*

In 2009, police were dispatched to a 911 hangup. When they arrived at the caller's location, A.R., the mother of Defendant's son, answered the door and told officers that Defendant had prevented her from getting her belongings and leaving. A.R. had bruises on her arms, but Defendant also had scratches on his body which he attributed to A.R. Police arrested both Defendant and A.R. for domestic violence. Ultimately Defendant was found guilty of Domestic Assault and fined.

Records also show that Defendant was arrested by Bel-Ridge PD in November 2012 for felony Domestic Assault 2nd Degree. Ex. 1, p. 3–4. Details are sparse, but when Defendant was released just an hour after booking, charges were never issued because "victim refuses to assist." *Id.*

---

[16] Exhibit 1 includes excerpts of police reports, CAD records, and a petition for an order of protection previously tendered in discovery as "Kevin Smith-- Breckenridge Hills reports.pdf."

In December 2017, Defendant was cited with disorderly conduct in the midst of a domestic dispute with his live-in girlfriend, D.W. Ex. 1, p. 5–6.

Then in April and May of 2019, Breckenridge Hills police reports show a series of domestic incidents between D.W. and Defendant. *Id.* at 7–11. D.W. alleged that Defendant destroyed her television because she told him to move out. In another incident, D.W. said that Defendant had kicked her door threatened to shoot through the door. *Id.* at 10. The victim stated, "she saw Kevin holding a black handle gun, however when he knew the police was called he walked to a friend of his vehicle and placed the gun inside the friend['s] car and returned to his truck- entered his truck and began to leave." *Id.* at 11. No gun was recovered.

Then in October 2020, a different woman, S.H., petitioned a St. Louis County Court for an emergency order of protection. Ex. 1, p. 12–15. This order of protection is worth mentioning due to the similarities between the threats Defendant made to L.A. and S.H.: "I am very afraid of the Respondent. He told me 'I will shoot you and your mother in the head!'" Ex. 1, p. 14. Additionally, the petitioner alleged, "A couple months ago he told me he would kill me and I was scard [*sic*] for my life. I was in the car with him when this happen..." *Id.* at 15. The petitioner explained, "He also called and harassed my mother telling her he would 'blow up her truck and shoot her in the head.' He has threatened me and my family because I don't want to be with him. He lied about his age telling me he's 26 but I found out he's 37 and he kept lying to date me." *Id.* In the instant offense, Defendant threatened to shoot L.A. in the head while they were in his car. At the time of

12

the offense Defendant was 39 years old to L.A.'s 21 years, and L.A. text messaged her sister that Defendant also lied to her about his age.

Finally, Defendant was arrested for Fourth Degree Assault by St. Peters (MO) Police in 2021 and there was an allegation that Defendant strangled the victim in his car, but charges were eventually dismissed.

Defendant's history of arrests for domestic violence shows a deep-seated pattern of violence toward intimate partners and family members. In summary, records show that Defendant was: arrested in 2007 for Domestic Assault 3rd (charges refused, "victim unavailable"); convicted of Domestic Assault in July 2009 and fined (victim A.R.); arrested for Assault 2nd Degree in November 2012 (charges refused, "victim refuses to assist"); cited by Breckenridge Hills PD in 2017 for disturbing the peace during a domestic incident (victim D.W.); contacted by Breckenridge Hills PD in 2019 for domestic violence and property damage (victim D.W.); arrested by St. Peters police for Domestic Assault/Fourth Degree in 2019 (charges dismissed, victim was Defendant's father); respondent to an order of protection in 2020 (victim S.H.); arrested by St. Peters Police in 2021 for Domestic Assault/Fourth Degree with an allegation of strangulation (charges dismissed, victim D.W.); and then arrested for the instant offense in 2022 (victim L.A.).

The potential for witness tampering in this case was so obvious that Judge Sison cited it as one of the reasons for detention in February 2023. Doc. 18, p. 3. Despite blocking L.A.'s phone number at the Jefferson County jail on multiple occasions, L.A. and Defendant always managed to reconnect and resume speaking to each other. L.A. was

13

unfortunately the most recent victim in Defendant's long history of domestic violence toward intimate partners.

2. <u>The need for the sentence imposed to accomplish each of the purposes of sentencing;</u>

    A. *<u>to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>*;

The seriousness of this offense is reflected by the maximum punishment for the offense of kidnapping: life imprisonment. It is a minor miracle that L.A., her unborn daughter, or Defendant were not seriously injured during this incident. Although L.A. was not physically harmed during the kidnapping, the threats that Defendant made to her could not be more dire. Defendant could not have been more graphic or detailed in his threats to "blow her brains out" or bury her in a field while he handled his pistol and racked the slide of his gun just to prove that he was serious. Additionally, as the academic literature points out, threats with firearms dramatically raise the risk of femicide. Threats to pregnant women also carry an increased risk of maternal mental health problems and trauma. Pregnant mothers deserve additional support, respect, and protection, but L.A. received the total opposite from Defendant; she got death threats.

Long before L.A.'s kidnapping, Defendant repeatedly demonstrated that he has no respect for the law by his history of traffic citations alone. Between 2007 and 2022, Defendant had 11 convictions and 11 additional arrests without conviction for driver's license or insurance infractions. Despite failing to hold a valid driver's license for over a decade, he continuously put himself behind the wheel, showing that he felt free to disregard even the most basic traffic laws.

**B.** *<u>to afford adequate deterrence to criminal conduct;</u>*

General deterrence will be served by a guideline sentence which underscores society's disdain for violent crime and the obstruction of justice. Kidnapping a pregnant woman at gun point to force her to obtain an abortion she did not want is one of the most controlling and manipulative acts imaginable, and the sentence should reflect that our society refuses to tolerate such behavior. Even after his guilty plea, Defendant went to extreme lengths to pressure and coerce the victim in order to obstruct justice and prevent full accountability for his actions. A serious sentence of imprisonment will give other would-be abusers pause and discourage them from inflicting the same trauma that L.A. experienced. Likewise, a serious sentence of imprisonment will underscore that witness tampering undermines our criminal justice system and will be decisively punished.

**C.** *<u>to protect the public from further crimes of the defendant; and</u>*

As detailed above, Defendant has a lengthy history of domestic violence belied by just one conviction. A guideline sentence of imprisonment will be Defendant's longest sentence by far, but given the seriousness of this offense, that is justified. A serious sentence to the Bureau of Prisons will protect L.A. and any other future intimate partners from this Defendant's proclivity toward domestic violence. For the term of his sentence, Defendant's incapacitation will prevent him from harming any more women.

3. <u>kinds of sentences available to the Court</u>;

There is no mandatory minimum for Count 1, and the maximum is life imprisonment. The court may impose no more than 5 years' supervised release, a fine of up to $250,000, and a special assessment of $100.

4. the Sentencing Guidelines;

Defendant's first felony conviction was in 2003, but it is too old to receive any criminal history points. Likewise, all of his traffic convictions are excluded. His one and only criminal history point comes from a marijuana offense in 2020. As a result, Defendant falls into Criminal History Category I.

The base offense level for kidnapping under USSG §2A4.1(a) is 32. An additional two points should be applied for the special offense characteristic (§2A4.1(b)(3)) that Defendant "otherwise used" a dangerous weapon, a Glock pistol, during the kidnapping. *See* Doc. 75, *Government's Response to Defendant's Objections to Presentence Investigation Report*. Following the Government's presentation of jail phone calls and texts between June 2024 and October 2024, an additional two points should be added for obstruction of justice. *See* Doc. 96. Obstruction and acceptance of responsibility are presumed to be incompatible. Defendant's obstructive conduct and his behavior toward L.A. indicate that he has not accepted responsibility for his actions, and he should receive no reduction for acceptance. The total offense level is properly calculated at 36. The USSG sentencing matrix yields an advisory guideline range of 188 to 235 months' imprisonment.

5. need to avoid unwarranted sentencing disparities among similarly situated defendants;

The Defendant should be compared to others throughout the country who have committed this same type of crime. Imposing a Guideline sentence is the best way to avoid disparities across the entire federal system. As the Seventh Circuit has said, "we have repeatedly held that a within-guidelines sentence necessarily takes into account

unwarranted disparities." See, e.g., *United States v. Matthews*, 701 F.3d 1199, 1205 (7th Cir.2012). This is because "the ranges are themselves designed to treat similar offenders similarly." *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir.2006). Indeed, we have noted that imposing a within-guidelines sentence is the surest way to avoid unwarranted disparities. *United States v. Babul*, 476 F.3d 498, 501–02 (7th Cir.2007); *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

## VI. Conclusion:

      Defendant's conduct threated the ultimate harm: sudden, immediate, and violent death. Threats with firearms are associated with dramatically higher rates of homicide, especially for young, black women like L.A. To reflect the seriousness of this offense, account for the severity of the threatened harm, promote respect for the law where Defendant has had none, deter others from similar crimes, and prevent this Defendant from continuing to commit domestic violence against intimate partners, the Government respectfully recommends a guideline sentence of 198 months' imprisonment.

    Respectfully submitted,

    UNITED STATES OF AMERICA,

    STEVEN D. WEINHOEFT
    United States Attorney

    *s/ John D. A. Trippi*

    JOHN D. A. TRIPPI
    Assistant United States Attorney
    Nine Executive Drive
    Fairview Heights, Illinois 62208
    (618) 628-3700 telephone
    E-mail: john.trippi@usdoj.gov